1
2
3
4
5
6

LESTER J. MARSTON
California State Bar No. 081030
RAPPORT AND MARSTON
405 West Perkins Street
Ukiah, California 95482
Telephone: 707-462-6846
Facsimile: 707-462-4235
Email: marston1@pacbell.net

7

*Attorney for Plaintiffs*

8

## UNITED STATES DISTRICT COURT

9

## CENTRAL DISTRICT OF CALIFORNIA

10
11
12
13
14

CHEMEHUEVI INDIAN TRIBE, on its
own behalf and on behalf of its members
*parens patriae*, CHELSEA LYNN
BUNIM, TOMMIE ROBERT OCHOA,
JASMINE SANSOUCIE, and NAOMI
LOPEZ,

15

                          Plaintiffs,

16

v.

17
18
19
20
21
22
23
24
25
26
27

JOHN McMAHON, in his official
capacity as Sheriff of San Bernardino
County, RONALD SINDELAR, in his
official capacity as Deputy Sheriff for San
Bernardino County, MICHAEL RAMOS,
in his official capacity as the District
Attorney of San Bernardino County,
JEAN RENE BASLE, in his official
capacity as County Counsel for San
Bernardino County, and MILES
KOWALSKI, in his official capacity as
Deputy County Counsel for San
Bernardino County,

                          Defendants.

Case No. 5:15-cv-01538-DMG-FFM

PLAINTIFFS' OPPOSITION TO
DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT; OR IN
THE ALTERNATIVE, FOR PARTIAL
SUMMARY JUDGMENT

Date:  June 30, 2017
Time: 2:00 p.m.
Courtroom 8C, 8th Floor
Before the Honorable Dolly M. Gee

28

# TABLE OF CONTENTS

INTRODUCTION ...................................................................................................1

ARGUMENT ........................................................................................................2

I. THE RESERVATION WAS ESTABLISHED, AND ITS BOUNDARIES WERE CREATED BY, THE 1907 ORDER AND A TRUST PATENT WAS NOT REQUIRED TO DO SO. ....................................................................................2

II. THE SECRETARY HAD THE AUTHORITY TO INCLUDE SECTION 36 WITHIN THE BOUNDARIES OF THE RESERVATION. ........................................8

III. THE FACT THAT SECTION 36 IS BORDERED BY FEDERAL BUREAU OF RECLAMATION LAND IS IRRELEVANT TO THE INDIAN COUNTRY ANALYSIS. ...................................................................................................10

IV. SECTION 36 IS ALSO INDIAN COUNTRY BECAUSE IT QUALIFIES AS A DEPENDENT INDIAN COMMUNITY UNDER 18 U.S.C. §1151(B). ....................13

V. IN INTERPRETING THE STATUTES AT ISSUE IN THIS CASE, THE COURT MUST APPLY THE INDIAN CANONS OF STATUTORY CONSTRUCTION. ....16

VI. BECAUSE THERE ARE GENUINE DISPUTES AS TO MATERIAL FACTS WITH REGARD TO THE COUNTY OFFICIALS' ASSERTIONS ABOUT PLAINTIFFS' SECTION 1983 CLAIMS, SUMMARY JUDGMENT CANNOT BE SUSTAINED WITH REGARD TO THIS ISSUE. ........................................................18

CONCLUSION .....................................................................................................21

# TABLE OF AUTHORITIES

**Federal Cases**

*Alaska v. Native Village of Venetie Tribal Government*, 522 U.S. 520 (1998)...............14

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242 (1986)....................................................19

*Arizona v. California,* 373 U.S. 546 (1963).........................................................4, 5, 7, 15

*Artichoke Joe's Cal. Grand Casino v. Norton*, 353 F.3d 712 (9th Cir. 2003)................17

*Ashcroft v. United States Dept. of Interior*, 679 F.2d 196 (9th Cir. 1982), [*cert. denied,* 459 U.S. 1201 (1983)] ........................................................................................16

*Bryan v. Itasca County*, 426 U.S. 373 (1976)........................................................16, 17

*Celotex Corp. v. Catrett* 477 U.S. 317 (1986) ...........................................................20

*Chemehuevi Indian Tribe v. United States,* 14 Ind. Cl. Comm. 651 (1965) ..................15

*County of Yakima v. Confederated Tribes and Bands of the Yakima Indian Nation*, 502 U.S. 251 (1992) ..............................................................................................17

*Coyote Valley Band of Pomo Indians v. United States*, 639 F. Supp. 165 (E.D. Cal. 1986)........................................................................................................16

*DeCoteau v. District County Court*, 420 U.S. 425 (1975) ...................................5, 11, 13

*Donnelly v. United States*, 228 U.S. 243 (1913).........................................................3, 14

*Mattz v. Arnett*, 412 U.S. 481 (1973).........................................................................3, 6

*Minnesota v. Hitchcock*, 185 U.S. 373 (1902).......................................................3, 10, 15

*Montana v. Blackfeet Tribe*, 471 U.S. 759 (1985).........................................................17

*NLRB v. Pueblo of San Juan*, 276 F.3d 1186 (10th Cir. 2002) ....................................17

*Oneida Indian Nation v. County of Oneida,* 414 U.S. 661 (1974) ..................................15

*Pechanga Band of Mission Indians v. Kacor Realty, Inc.*, 680 F.2d 71

  (9th Cir. 1982)....................................................................................6, 7

*Podberesky v. Kirwan*, 38 F.3d 147 (4th Cir. 1994)......................................21

*Rockbridge v. Lincoln*, 449 F.2d 567 (9th Cir. 1971)..................................16

*Sac & Fox Tribe v. Licklider*, 576 F.2d 145 (8th Cir. 1978) ......................3

*Santa Clara Pueblo v. Martinez*, 436 U.S. 49 (1978)..................................17

*Scott v. Henrich,* 978 F.2d 481 (9th Cir. 1992) .........................................19

*See v. Durang,* 711 F.2d 141 (9th Cir. 1983)..............................................19

*Semegen v. Weidner,* 780 F.2d 727 (9th Cir. 1985)....................................19

*Seymour v. Superintendent*, 368 U.S. 351 (1962)........................................13

*Solem v. Bartlett*, 465 U.S. 463 (1984)........................................................5

*Spalding* v. *Chandler*, 160 U.S. 394 (1896) ................................................3

*United States v. Azure*, 801 F.2d 336 (8th Cir. 1986)................................3

*United States v. Candelaria*, 271 U.S. 432 (1926) ....................................14

*United States v. Cooper,* 312 U.S. 600 (1941) ...........................................9

*United States v. John,* 437 U.S. 634 (1978)................................................3

*United States v. McGowan*, 302 U.S. 535 (1938)........................................3

*United States v. Midwest Oil Co*., 236 U.S. 459 (1915)..............................4

*United States v. Oklahoma Tax Comm'n,* 829 F. 2d 967 (10th Cir. 1987)

  [*cert. denied*, 487 U.S. 1218 (1988)] ...................................................14

*United States v. Pelican*, 232 U.S. 442 (1914) .........................................3

*United States v. Ron Jorgensen, et al.,* United States District Court Central District of California, Case No. CV-92-3809-TJH.........................................................5, 7

*United States v. Sandoval*, 231 U.S. 28 (1913)...........................................3, 14

*United States v. Santa Fe P.R. Co.,* 314 U.S. 339 (1941) ...............................15

*United States v. White*, 508 F.2d 453 (8th Cir. 1974)........................................3

*White Mountain Apache Tribe v. Bracker*, 448 U.S. 136 (1980) ...............16, 17

**United States Codes**

18 U.S.C. § 1151.................................................................................*passim*

18 U.S.C. § 1162.........................................................................................18

25 U.S.C. § 398d.....................................................................................6, 22

28 U.S.C. § 1360..................................................................................17, 18

**Other Authorities**

10 Stat. 244, (Act of March 1, 1853) ...................................................10, 15

26 Stat. 712, (Mission Indian Relief Act)..............................................*passim*

34 Stat. 1015, (Amendment Mission Indian Relief Act)..........................*passim*

**INTRODUCTION**

All of the claims made by Defendants John McMahon and Ronald Sindelar ("County Officials") in their Motion for Summary Judgment ("Motion") with respect to the establishment of the Chemehuevi Indian Reservation ("Reservation"), and the resulting status of Section 36, are claims that have been previously made against the Chemehuevi Indian Tribe numerous times and in numerous forums. In every instance, the Tribe has successfully defended its Reservation and its boundaries as they are defined in the Secretary of the Interior's February 2, 1907 Order ("1907 Order"). This case is no different.

The County Officials nevertheless ask the Court to find that, because a trust patent was not issued for the Reservation until 2010, and because Section 36 was not expressly included within that trust patent, Section 36 is not "Indian country" as defined by 18 U.S.C. § 1151 ("Section 1151"). Granting such a request would contravene the plain language of Section 1151 and the Mission Indian Relief Act, 26 Stat. 712 ("MIRA"), would rewrite the history of the Chemehuevi Indian Tribe, and, most importantly, would work to unsettle prior decisions of this Court and of the United States Supreme Court. The Court cannot accept the County Officials' request to do so.

In this brief, the Chemehuevi Indian Tribe and the individual Indian plaintiffs (collectively, the "Tribe") shall demonstrate that the County Officials' claim that Section 36 is not Indian country is wrong because: (1) the Reservation was established, and its boundaries were created by, the 1907 Order and a trust patent was not required to do so; (2) the Secretary had the authority to include Section 36 within the boundaries of the Reservation; (3) the fact that Section 36 is bordered by federal Bureau of Reclamation land is irrelevant to the Indian country analysis; (4) Section 36 is also Indian country because it qualifies as a dependent Indian community under 18 U.S.C. § 1151(b); and (5) all ambiguities in Section 1151, the MIRA, and the amendments to the MIRA, 34 Stat. 1015, 1022-1023 ("AMIRA"), have to be constructed in favor of the

1

Tribe. The Tribe further demonstrates in this brief that a genuine dispute of material fact exists as to whether the County Officials engaged in a pattern and practice of racial profiling and discrimination by targeting the tribal members based on their race. For these reasons, the Tribe respectfully requests that the Court deny the County Officials' Motion and grant the Tribe's Motion for Partial Summary Judgment.

## ARGUMENT

## I.

**THE RESERVATION WAS ESTABLISHED, AND ITS BOUNDARIES WERE CREATED BY, THE 1907 ORDER AND A TRUST PATENT WAS NOT REQUIRED TO DO SO**.

The County Officials' claim that Section 36 is not Indian country is founded upon the incorrect conclusion that the 1907 Order could not, and did not, create the Reservation and establish its boundaries. "[The Tribe] may not rely on the Secretary's order recommending that the land be withdrawn from settlement." Motion, p. 9. Rather, the County Officials assert that: "[t]he [1907] Order, by itself, did not establish the boundaries of the Reservation." *Id*. (emphasis in original). The County Officials allege that "establish[ing] an Indian Reservation pursuant to MIRA or [the amendments to the MIRA ("AMIRA")] . . . was a twostep-process [*sic*]. First, the Secretary had to select and set aside the designated land; second, the Secretary was required to issue a trust patent." *Id*. at p. 8.

Under this logic, the County Officials conclude that "the Chemehuevi Indian Reservation was not lawfully established until the [Bureau of Land Management] issued the Trust Patent [in 2010] establishing the boundaries of the reservation." *Id*. at pp. 8-9. Because Section 36 is not included in the trust patent, the County Officials claim, it must never have been "included within the boundaries of the Reservation," *id*. at p. 6, and is not, therefore, Indian country.

Each of the foregoing claims are rebutted by the plain language of the relevant statutes and the cases interpreting those statutes, the well-documented history of the

2

Tribe, and prior decisions of this Court and the United States Supreme Court, which both expressly rejected these same arguments.

The County Officials' unsubstantiated assertion that the 1907 Order did not create the Reservation and establish its boundaries is in conflict with voluminous and well-established court precedent.

> [I]n order to create a reservation, it is not necessary that there should be a formal cession or a formal act setting apart a particular tract. It is enough that from what has been done there results a certain defined tract appropriated to certain purposes. Here, the Indian occupation was confined by the treaty to a certain specified tract. That became, in effect, an Indian reservation.

*Minnesota v. Hitchcock*, 185 U.S. 373, 390 (1902).

> [I]n our judgment, nothing can more appropriately be deemed "Indian country," within the meaning of those provisions of the Revised Statutes that relate to the regulation of the Indians and the government of the Indian country, than a tract of land that, being a part of the public domain, is lawfully set apart as an Indian reservation.

*Donnelly v. United States*, 228 U.S. 243 (1913).

> In the present case, the original reservation was Indian country simply because it had been validly set apart for the use of the Indians as such, under the superintendence of the Government.

*United States v. Pelican*, 232 U.S. 442, 449 (1914). *See also Spalding v. Chandler*, 160 U.S. 394, 403-404 (1896); *United States v. Sandoval*, 231 U.S. 28 (1913); *United States v. McGowan*, 302 U.S. 535 (1938); *Mattz v. Arnett*, 412 U.S. 481 (1973); *United States v. White*, 508 F.2d 453, 456-57 (8th Cir. 1974); *United States v. John,* 437 U.S. 634, 648-649 (1978); *Sac & Fox Tribe v. Licklider*, 576 F.2d 145 (8th Cir. 1978); *United States v. Azure*, 801 F.2d 336, 338-339 (8th Cir. 1986); *Oklahoma Tax Comm'n v. Sac & Fox Nation,* 508 U.S. 114, 125 (1993).

Thus, there is no basis for concluding that the 1907 Order did not, by itself, create the Reservation and establish its boundaries.

The County Officials' allegation that the Reservation and its boundaries were not established until the trust patent was issued in 2010 is even more absurd in light of the fact that the United States Supreme Court and this Court have already ruled, prior to 2010, that the 1907 Order created the Reservation and established its boundaries.

In *Arizona v. California,* 373 U.S. 546 (1963), the Supreme Court expressly found that the 1907 Order created the Reservation: "**The Chemehuevi Reservation was established by the Secretary of the Interior on February 2, 1907, pending congressional approval.**"[1] *Id.* at 596, fn. 100 (emphasis added). Citing to *United States v. Midwest Oil Co.,* 236 U.S. 459, 469-475 (1915), the Supreme Court continued:

> Some of the reservations of Indian lands here involved were made almost 100 years ago, and all of them were made over 45 years ago. In our view, these reservations, like those created directly by Congress, were not limited to land, but included waters as well. Congress and the Executive have ever since recognized these as Indian Reservations. Numerous appropriations, including appropriations for irrigation projects, have been made by Congress. They have been uniformly and universally treated as reservations by map makers, surveyors, and the public. **We can give but short shrift at this late date to the argument that the reservations either of land or water are invalid because they were originally set apart by the Executive.**

*Id.* at 598 (emphasis added).

The Supreme Court has, therefore, expressly held that the Reservation was lawfully established and its boundaries created by the 1907 Order.

---

[1] Congressional approval came on March 1, 1907 in the AMIRA.

In addition to the Supreme Court, this Court, presented with the same arguments made by the County Officials here, that the 1907 Order did not create the Reservation and establish its boundaries, concluded that the Reservation was lawfully established by the 1907 Order—in the absence of a trust patent:

> [T]he Chemehuevi Indian Reservation was established by duly authorized Secretarial order of February 2, 1907. The power of the executive branch to establish Indian reservations by Executive Order, as was done in this case, has been unequivocally sustained by the United States Supreme Court. See e.g. Arizona v. California, 373 U.S. 546, 598 . . . (1963). **Defendants' arguments to the contrary notwithstanding, this Court finds that the Chemehuevi Indian Reservation . . . is a duly authorized Indian reservation held in trust by the United States of America for the Chemehuevi Indian Tribe**.

October 10, 1995, Statement of Uncontroverted Facts and Conclusion of Law, *United States v. Ron Jorgensen, et al.,* United States District Court Central District of California, Case No. CV-92-3809-TJH ("*Jorgensen*"), Plaintiffs' Request for Judicial Notice, p. 2, ¶ 1, Exhibit J, p. 6, ¶ 2 (emphasis added).

The Supreme Court in *Arizona v. California* and this Court in the *Jorgensen* case both found that the Reservation was lawfully created and its boundaries were established by the 1907 Order—prior to the issuance of any trust patent. The eventual issuance of the trust patent in 2010 does nothing to change that analysis or those holdings.[2] The trust patent simply demarcates which lands within the boundaries of the

_____

[2] If the County Officials were to try to argue that the trust patent somehow changed the boundaries of the Reservation as established by the 1907 Order, such an argument would be wrong. It is well-settled law that, once an Indian reservation has been established, all of its tracts remain a part of the reservation and are Indian country unless or until Congress enacts a statute changing those boundaries. *DeCoteau v. District County Court*, 420 U.S. 425 (1975). Only Congress can divest a reservation of its land, diminish its boundaries, or disestablish it all together. *Solem v. Bartlett*, 465 U.S. 463,

Reservation, as established by the 1907 Order, are held in trust for the Tribe by the United States. The 1907 Order established the boundaries of the Reservation for purposes of determining which government's, (i.e. the United States, the tribes or the states), laws would apply to persons within those boundaries and the trust patent established the boundaries of the Tribe's trust lands for purposes of determining who owned the land within the boundaries of the Reservation. The 1907 Order, thus, determined jurisdiction and the trust patent determined title or ownership to the land. Thus, because the Secretary specifically withdrew and set apart Section 36 as part of the Reservation when he lawfully established the Reservation's boundaries in the 1907 Order, Section 36 is Indian country.

The only legal authority to which the County Officials cite in support of their argument that a trust patent was required to lawfully establish the Reservation is *Pechanga Band of Mission Indians v. Kacor Realty, Inc.*, 680 F.2d 71 (9th Cir. 1982). Despite the initial appeal of this case, *Pechanga* has no relevance to the current dispute.

The *Pechanga* decision neither addressed the issue of what type of action is required to establish an Indian reservation, in general, nor, in particular, whether a patent was required to complete the establishment of the Pechanga reservation. *Pechanga* was a quiet title action in which the tribe claimed ownership of land that was not included within the boundaries of its reservation when it was established. *Pechanga* related to the ownership of land that, at the time of the establishment of the Pechanga reservation, was in dispute by an individual and the subject of litigation.[3] The issuance of a patent was relevant because, at the time of the establishment of the Pechanga reservation, the Secretary intentionally excluded the disputed land from the reservation.

---

470 (1984); *Mattz v. Arnett*, 412 U.S. 481, 485 (1973). In fact, it is a violation of federal law to change the boundaries of the Reservation without congressional approval. 25 U.S.C. § 398(d).

[3] In addition, this case dealt with the issuance of a patent to an individual and not to the State of California for school purposes.

> The Pechanga Band's present reservation was established pursuant to the 1891 Act. . . . The Secretary of the Interior, however, decided to issue a patent only to the uncontested parcels and await a judicial determination on whether Mouren had a valid right to the land at issue. Because the Government dropped its suits against Mouren prior to any decision on the merits, the Secretary never issued a patent to the Band for the land.

*Pechanga*, 680 F.2d at 74.

The court, therefore, found that "[t]he Mission Indians Relief Act of 1891 worked to extinguish whatever interest the Band had in the land pursuant to the 1882 Executive Order." *Id*. at 74.

The *Pechanga* case does not and cannot stand for the proposition that the issuance of a trust patent was necessary for the establishment of the Reservation.[4] A conclusion to the contrary would contradict the Supreme Court's unequivocal determination in *Arizona v. California* that "[t]he Chemehuevi Reservation was established by the Secretary of the Interior on February 2, 1907…," *Id*. at 596, fn. 100, as well as this Courts conclusion in *Jorgensen* that ". . . the Chemehuevi Indian Reservation . . . is a duly authorized Indian reservation held in trust by the United States of America for the Chemehuevi Indian Tribe." October 10, 1995 Statement of Uncontroverted Facts and Conclusion of Law, *Jorgensen*, Plaintiffs' Request for Judicial Notice, p. 2, ¶ 1, Exhibit J, p. 6, ¶ 2.[5]

Moreover, here, the Secretary expressly included Section 36 in the 1907 Order withdrawing the lands for the use and occupancy of the Tribe. Under the plain wording

---

[4] Furthermore, the issue actually decided by the *Pechanga* court was whether the Secretary of the Interior could change a boundary established by an executive order. In the instant case, it is the Secretary's own order issued pursuant to the MIRA and the AMIRA that established the boundaries of the Reservation—and it is that 1907 Order that included Section 36 within those boundaries.

[5] It is also notable that no court has ever cited to *Pechanga* as legal precedent.

of the MIRA and the AMIRA, that withdraw immediately became valid upon the issuance of the 1907 Order, not the patent.

> That it shall be the duty of said commissioners to select a reservation for each band . . . which reservation shall include, as far as practicable, the lands . . . in the actual occupation and possession of said Indian . . . **which selection shall be valid when approved by the President and the Secretary of the Interior.**

MIRA, 26 Stat. 712 (emphasis added).

Congress clearly intended that upon the withdrawal of the lands by the Secretary the reservation so selected immediately became "valid" and the boundaries of the reservation established. The subsequent issuance of the trust patent was merely a deed evidencing which lands within the reservation was owned by the United States in trust for the Tribe and available for allotment after the expiration of the 25 year trust period.

The foregoing discussion leaves no room for the County Officials' argument that the Secretary's 1907 Order did not establish the Reservation and its boundaries. The 1907 Order did, in fact, establish the Reservation and its boundaries, and the issuance of a trust patent was not required for the Secretary to do so. Thus, because the Secretary specifically withdrew and set apart Section 36 as part of the Reservation when he lawfully established the Reservation in the 1907 Order, Section 36 is Indian country.[6]

## II.

## THE SECRETARY HAD THE AUTHORITY TO INCLUDE SECTION 36 WITHIN THE BOUNDARIES OF THE RESERVATION.

---

[6] 18 U.S.C. § 1151(a)[Indian country includes "all land within the limits of any Indian reservation under the jurisdiction of the United States Government, **notwithstanding the issuance of any patent**, and, including rights-of-way running through the reservation…"](emphasis added).

The County Officials argue that, "even if the Secretary could have established the boundaries of the Reservation without a patent, Section 36 was not subject to Congress' power of disposition, and therefore could not have been included in the Reservation." Motion, p. 9. To support this claim, the County Officials posit that, since "[t]he MIRA and [AMIRA] expressly provided 'that no patent shall embrace any tract or tracts to which existing valid rights have been attached,'" the Secretary "could not include [Section 36] in the Reservation, even if so intended. . . [b]ecause Section 36 had already been surveyed and granted to the State prior to the Secretarial Order." *Id.* This argument is wrong because the Secretary is very clearly authorized to include land patented to a state for school purposes within the boundaries of an Indian reservation.

The language of the MIRA makes it clear that the Secretary and President are authorized by Congress to create "reservations" for the Mission Indians, excepting "any tract or tracts to which existing valid rights have attached in favor of any **person** under any of the United States laws providing for the disposition of the public domain. . . ." MIRA, Sec. 3 (emphasis added).[7] The exception set forth in Section 3 of MIRA, however, does not apply so as to prohibit the Secretary from including Section 36 within the boundaries of the Reservation for two reasons.

First, the claims to ownership of parcels within Section 36 are dependent on the conveyance of Section 36 by the United States to the State of California. California is not a "person" within the meaning of Section 3 of the MIRA. When Congress uses the term "person" in a federal statute and does not define the term, it is presumed that the term excludes a sovereign governmental entity, unless the plain wording of the statute or legislative history evidences a clear Congressional intent to include a sovereign government within the purview of the statute. *United States v. Cooper,* 312 U.S. 600 (1941). Even giving Section 3 the broadest interpretation possible, there is nothing in

---

[7] The County Officials conveniently omit from their quote of Section 3 of the MIRA the following language: "in favor of any person[.]" *See* Motion, p. 9, lls. 18-19.

either the plain wording of the MIRA or its legislative history evidencing an intent on the part of Congress to have the term "person" include the State of California.

Second, the exception in Section 3 of the MIRA only applies to vested rights obtained "under any of the United States laws providing for the disposition of the **public domain** . . . ." (emphasis added). The conveyance of Section 36 by the United States to the California was made to the State pursuant to Section 6 of the Act of March 3, 1853, 10 Stat. 244, 245-246. That statute had the effect of preventing Section 36 from becoming land on the public domain, because it excluded from its application land occupied by Indians. Section 6 contained a proviso stating that the 1853 Act "shall not be construed to authorize any settlement to be made on any tract of land in the occupation or possession of any Indian tribe, or to grant any preemption right to the same." *Id*.   Therefore, the exemption in Section 3 of the MIRA relating to the "disposition of the public domain" has no application to Section 36, and the Secretary and/or President were expressly authorized to include all other lands within any reservation created under the MIRA, including Section 36, which was contained in the 1907 Order. *See Minnesota v. Hitchcock*, 185 U.S. 373 (1902)[holding grants of Section 36 "[were] of public lands" and, therefore, lands encumbered by Indian title were not available for selection by state].

Thus, because the Secretary included Section 36 in the 1907 Order creating the Reservation, and because the Secretary had the authority to do so, pursuant to the MIRA, Section 36 is "Indian country" within the meaning of 18 U.S.C. § 1151.

### III.
### THE FACT THAT SECTION 36 IS BORDERED BY FEDERAL BUREAU OF RECLAMATION LAND IS IRRELEVANT TO THE INDIAN COUNTRY ANALYSIS.

Under Section 1151(a), "Indian country" includes "**all land within the limits of any Indian reservation** under the jurisdiction of the United States Government, notwithstanding the issuance of any patent, and, including rights-of-way running through the reservation . . ." (emphasis added). Section 36 is within the limits of the

Reservation and is, therefore, Indian country, because, notwithstanding the patent issued to the State of California, that particular section was withdrawn and set aside by the Secretary in the 1907 Order establishing the boundaries—*i.e.* "the limits"—of the Reservation. That should be the end of the analysis.

Nevertheless, the County Officials make the argument, practically out of thin air, that Section 36 is not Indian country under 18 U.S.C. § 1151(a) because "Section 36 is not landlocked by the Reservation such that it is 'Indian County' [*sic*]." Motion, p. 10, This argument, premised on dicta in a footnote from *DeCoteau v. District County Court*, 420 U.S. 425, 427 fn. 2 (1975), is based on the County Officials assertion that, to be "within the limits" of an Indian reservation, the land must be "within a continuing reservation." *Id*. "The purpose of this provision," the County Officials claim, "is to avoid an 'impractical pattern of checkerboard jurisdiction.'" Motion, p. 11, *citing DeCoteau v. District County Court*, 420 U.S. at 468.

The footnote, which cites to no legal authority for the proposition contained therein, does not state what would constitute a "continuing reservation"—and neither do the County Officials.[8] Rather, the County Officials jump to the conclusion that ". . . Section 36 is not within the boundaries of a continuing reservation, and thus, no checkerboard jurisdiction is created." Motion, p. 11. "To the contrary," the County Officials claim:

> Section 36 is bordered on its south side not by reservation property, but by Bureau of Reclamation land managed by the Bureau of Land Management. In fact, although Defendants dispute that the Grazing Map submitted by Plaintiffs is evidence of the true Reservation boundaries; that map shows the land bordering Section 36 to the south is not within

---

[8] The statement made in the footnote in *DeCoteau v. District County Court*, 420 U.S. at 427 fn. 2, was irrelevant to the Court's decision. In that case, the Court held that the Lake Traverse Indian Reservation, created by an 1867 treaty, was terminated and returned to the public domain by an act of Congress.

the Reservation. . . . Because it is not landlocked, the concern about an impractical pattern of checkerboard jurisdiction is not present. Section 36 is not part of the Chemehuevi Indian Reservation, and because the land bordering the south of Section 36 is not part of the Chemehuevi Indian Reservation, Section 36 does not fall within "Indian Country."

*Id.*

This argument defies all logic. First, nothing in the plain language of Section 1151(a) states that land within the limits of an Indian reservation must be within a "continuing reservation" to be considered Indian country. Second, Section 1151 does not set forth criteria dictating how or where land must be set aside for Indians or Indian tribes in order to qualify as "Indian country," so long as the land is "within the limits" of a reservation.[9]

Finally, and most obviously, the County Officials' claim that accepting its position will avoid "an impractical pattern of checkerboard jurisdiction" because Section 36 "is not landlocked" is ridiculous. Motion, p. 11. Section 36 is bordered on three of its four sides by land owned by the United States in trust for the Tribe. On its fourth side, as the County Officials point out, Section 36 is bordered by Bureau of Reclamation land managed by the Bureau of Land Management. Thus, under the County Officials' reasoning, the Court would somehow avoid creating an impractical pattern of checkerboard jurisdiction if it found State jurisdiction existed over a single section that is completely surrounded on all sides by tribal trust land and federal land. This is ludicrous. If that were the case, a tribal member driving through Section 36 from their on-Reservation home to the on-Reservation tribal grocery store would, on the half-mile stretch of Havasu Lake Road that runs through Section 36, pop in and out of State

---

[9] *Oklahoma Tax Comm'n v. Sac & Fox Nation*, 508 U.S. 114, 125 (1993), *citing Cohen's Handbook of Federal Indian Law* 34 (emphasis added) ["The intent of Congress, as elucidated by [Supreme Court] decisions, was to designate as Indian country all lands set aside *by whatever means* for the residence of tribal Indians under federal protection, together with trust and restricted Indian allotments.'"].

1    jurisdiction in the 45 seconds it takes to enter and exit Section 36. If such a scenario is

2    not a pattern of checkerboard jurisdiction, then not much else could be.

3        It is the Tribe's position that Section 36 is Indian country which, in fact, prevents

4    the impractical pattern of checkerboard jurisdiction that Congress intended to eliminate

5    through the enactment of Section 1151. Because Section 36 is Indian country, tribal

6    members driving from their homes to work do not pass through an island of State

7    jurisdiction surrounded on three sides by tribal trust land and one side by federal land.

8    There is, therefore, "no justification for adopting an unwarranted construction" of the

9    1907 Order "where the result would be merely to recreate confusion Congress

10   specifically sought to avoid." *Seymour v. Superintendent*, 368 U.S. 351, 358 (1962).

11       Accordingly, whether or not Section 36 is "landlocked" by tribal trust land is

12   irrelevant to the Indian country analysis because Section 1151(a) does not so require.

13   Additionally, a finding that Section 36 is Indian country avoids creating an unwarranted

14   pattern of checkerboard jurisdiction.[10]

## IV.

### SECTION 36 IS ALSO INDIAN COUNTRY BECAUSE IT QUALIFIES AS A DEPENDENT INDIAN COMMUNITY UNDER 18 U.S.C. § 1151(B).

Without citing to any authority in support of its position, the County Officials

baldly assert that Section 36 is not "Indian country" because it "is not a dependent

Indian community. . . ." Motion, p. 10. Nothing could be further from the truth. Even

assuming for argument's sake that the 1907 Order did not create the Reservation and

---

[10] It is possible that the "continuing reservation" language in *DeCoteau v. District County Court*, 420 U.S. 425 (1975), was in reference to off-reservation land purchased by or granted to a tribe that is not otherwise contiguous to an existing reservation. In any event, even if being part of a "continuing reservation" was considered a piece of the Indian country analysis, Section 36 would constitute a continuing reservation. Section 36 is a parcel on the outer portion of the Reservation boundary. To consider it otherwise would create a jagged boundary and a singular section under state jurisdiction surrounded by federal and tribal jurisdiction. This would require the County Officials to have a tract map and the boundaries of Section 36 mounted on the ground to know whether or not the State had jurisdiction over tribal members.

establish its boundaries, which it did, Section 36 would still be "Indian country" because the lands set aside by the 1907 Order, including Section 36, are a "dependent Indian community" within the meaning of Section 1151(b).

Since the early definition of "Indian country" applied to the aboriginal title of lands occupied by tribes and recognized by treaties, the removal of Indians to reservations raised the issue of whether those lands set aside for tribes by congressional act or executive order were "Indian country" because they were not, in many instances, lands to which the tribes held aboriginal title. In *Donnelly v. United States*, 228 U.S. 243 (1913), the Supreme Court rejected this distinction and specifically held that land set aside from the public domain by executive order for use as an Indian reservation was "Indian country."

Not all lands presently set aside for Indian tribes are the product of the federal reservation policy and, thus, some Indian lands are not technically reservations. In *United States v. Sandoval*, 231 U.S. 28 (1913), the Supreme Court held that the lands of the Pueblo Indians, which were not federally recognized reservations, but rather consisted of communally owned lands held in fee simple, were nonetheless "Indian country," since the Pueblos were distinct "Indian communities" which were "dependent tribes" recognized and protected by the federal government. *See also United States v. Oklahoma Tax Comm'n,* 829 F. 2d 967 (10th Cir. 1987), *cert. denied*, 487 U.S. 1218 (1988). The Court later held that the Pueblo lands could not be alienated without the consent of the United States. *United States v. Candelaria*, 271 U.S. 432 (1926). Dependent Indian communities, thus, are "Indian country" whether or not they are located within a recognized reservation.

In *Alaska v. Native Village of Venetie Tribal Government*, 522 U.S. 520, 527 (1998) ("*Alaska*"), the Supreme Court established the criteria necessary for finding that land set aside for a tribe was "Indian country." To be "Indian country," the Court in *Alaska* held that the land must be set aside for the use of Indians and that the tribe must be under the superintendence of the federal government. *Id*. The Court further defined

federal superintendence to mean that the tribe must be "sufficiently 'dependent' upon the Federal Government, that the Federal Government and the Indians involved, rather than the states, are to exercise primary jurisdiction over the land in question." *Id.* at 531. *See also* Plaintiffs' Request For Judicial Notice In Opposition To Defendants' Motion For Summary Judgment, Exhibit 1, pp. 24-32.

Without a doubt, the Tribe meets both of these requirements. First, all of the land, including Section 36, was part of the Tribe's aboriginal territory reserved and set aside for the Tribe by the Act of March 1, 1853. [ . . . "this Act shall not be construed' to authorize any settlement to be made on any land in the occupation or possession of an Indian tribe, or to grant any pre-exemption right to the same"], Act of March 1, 1853, 10 Stat. 244, 246-247; *See Chemehuevi Indian Tribe v. United States,* 14 Ind. Cl. Comm. 651, 653-654 (Findings of Fact) (1965). Thus, the 1853 statute expressly recognized the Tribe's aboriginal title to Section 36 and that the conveyance by the United States of Section 36 to the State of California for school purposes took subject to the Tribe's aboriginal title or right of occupancy. *Oneida Indian Nation v. County of Oneida,* 414 U.S. 661 (1974); *United States v. Santa Fe P.R. Co.,* 314 U.S. 339 (1941); *Minnesota v. Hitchcock,* 185 U.S. 373 (1902) [holding grants of Section 16 and 36 "[were] of public lands," *id.* at 391, and therefore lands encumbered by Indian aboriginal title were not available for selection]. Second, Section 36 was expressly reserved and set aside for the Chemehuevi by the 1907 Order. Third, under the 2010 Trust Patent for the Reservation, the exclusion of Section 36 from the patent was "subject to any existing valid rights," including the Tribe's aboriginal title to Section 36. Finally, the Tribe has been under the continued superintendence of the United States since the issuance of the 1907 Order. *Arizona v. California,* 373 U.S. 546 (1963)  [holding continued recognition by Congress and Executive of the Chemehuevi Reservation sufficient to find the Reservation was lawfully set aside and created].

Thus, regardless of whether the 1907 Order created the Reservation, the lands set aside by the 1907 Order are a "dependent Indian community" and "Indian country," including Section 36.

## V.

### IN INTERPRETING THE STATUTES AT ISSUE IN THIS CASE, THE COURT MUST APPLY THE INDIAN CANONS OF STATUTORY CONSTRUCTION.

"In light of the special trust relationship between the United States and Indian tribes, this court must also be mindful of well-established canons of statutory construction which have been developed to construe federal statutes affecting Indian affairs." *Coyote Valley Band of Pomo Indians v. United States*, 639 F. Supp. 165, 170 (E.D. Cal. 1986). For over 180 years, "the courts have consistently applied the principle that statutes passed for the benefit of Indian tribes and communities are to be liberally construed in favor of the Indians, and any doubt as to a statute's proper construction is to be resolved in their favor." *Id.*, *citing Bryan v. Itasca County*, 426 U.S. 373, 392 (1976), *Ashcroft v. United States Dept. of Interior*, 679 F.2d 196, 198 (9th Cir. 1982), *cert. denied*, 459 U.S. 1201 (1983), and *Rockbridge v. Lincoln*, 449 F.2d 567, 571 (9th Cir. 1971).

> The right of tribal self-government is ultimately dependent on and subject to the broad power of Congress. Even so, traditional notions of Indian self-government are so deeply engrained in our jurisprudence that they have provided an important "backdrop," . . . against which vague or ambiguous federal enactments must always be measured.

*White Mountain Apache Tribe v. Bracker*, 448 U.S. 136, 143 (1980).

If a statute passed for the benefit of Indians is subject to more than one interpretation, a court analyzing the competing interpretations is required to apply these Indian canons of statutory construction. "When we are faced with these two possible constructions, our choice between them must be dictated by a principle deeply rooted in

this Court's Indian jurisprudence: 'Statutes are to be construed liberally in favor of the Indians, with ambiguous provisions interpreted to their benefit.'" *County of Yakima v. Confederated Tribes and Bands of the Yakima Indian Nation*, 502 U.S. 251, 269 (1992), *citing Montana v. Blackfeet Tribe*, 471 U.S. 759, 766 (1985).

Since Congress is exercising a trust responsibility when dealing with Indians, the canons of construction require courts to presume that Congress' intent toward them is benevolent and that statutes and other federal actions should be read as protecting Indians. Courts are required to apply the canons of construction even if they find that the interpretation favoring the Indians is not the best interpretation: "We adopt Defendants' construction, not because it is necessarily the better reading, but because it favors Indian tribes and the statute at issue is both ambiguous and intended to benefit those tribes." *Artichoke Joes Cal. Grand Casino v. Norton*, 353 F.3d 712, 730 (9th Cir. 2003). Courts are required to adopt the interpretation that is most favorable to tribes because of the importance of tribal sovereignty: "Ambiguities in federal law have been construed generously in order to comport with…traditional notions of sovereignty and with the federal policy of encouraging tribal independence." *White Mountain Apache Tribe v. Bracker*, 448 U.S. 136, 143-144 (1980).

The rules for construing federal statutes dealing with Indians and Indian tribes require that courts apply a broad construction when the issue is whether Indian rights are reserved or established and a narrow construction when the issue is whether Indian rights are to be abrogated or limited. *Santa Clara Pueblo v. Martinez*, 436 U.S. 49 (1978) [narrowly construing the waiver of sovereign immunity in the Indian Civil Rights Act to limit jurisdiction of federal courts to habeas corpus review of tribal action]; *Bryan v. Itasca County*, 426 U.S. 373 (1976) [narrowly construing 28 U.S.C. § 1360 by refusing to find Congressional abrogation of Indian immunity from state taxation]; *NLRB v. Pueblo of San Juan*, 276 F.3d 1186, 1195–1196 (10th Cir. 2002) ["[W]e . . . do not lightly construe federal laws as working a divestment of tribal

sovereignty and will do so only where Congress had made its intent clear that we do so"].

Here, there is no question that the Indian canons of construction apply to the interpretation of the MIRA, the AMIRA, Section 1151, and Public Law 280, 18 U.S.C. § 1162 and 28 U.S.C. § 1360, because these are statutes that were passed for the benefit of Indians and Indian tribes Analyzed through the lens of the Indian canons of statutory construction, these statutes must be construed broadly when the issue is whether Indian rights are reserved or established and narrowly when the issue is whether Indian rights are to be abrogated or limited. Accordingly, the authority given to the Secretary in the MIRA and the AMIRA to establish Indian reservations—an act where Indian rights are reserved and established—must be interpreted broadly so as to permit the Secretary to establish reservation boundaries by Secretarial order and to include within those boundaries land patented to states. Furthermore, Public Law 280 must be interpreted narrowly so as to limit a divestiture of tribal jurisdiction in favor of the State. Finally, the definition of Indian country, as set forth in Section 1151, must be interpreted broadly in favor of the Indians.

For these reasons, the Indian canons of statutory construction counsel in favor of a finding that Section 36 is Indian country.

## VI.

**BECAUSE THERE ARE GENUINE DISPUTES AS TO MATERIAL FACTS WITH REGARD TO THE COUNTY OFFICIALS' ASSERTIONS ABOUT PLAINTIFFS' SECTION 1983 CLAIMS, SUMMARY JUDGMENT CANNOT BE SUSTAINED WITH REGARD TO THIS ISSUE.**

In their Motion, the County Officials argue that "the undisputed facts demonstrate that Plaintiffs cannot prove an essential element of its causes of action" and that they, therefore, are entitled to judgment as a matter of law. Though the quoted language from the Motion refers more particularly to the County Officials' assertion that Section 36

does not fall within the Tribe's Indian country, the County Officials also argue that it is undisputed that Plaintiffs failed to show that the County Officials engaged in racially-motivated discriminatory practices and that the San Bernardino County Deputy Sheriffs ("Deputies") acted outside of their authority by improperly citing tribal members on land within the boundaries of the Reservation. However, the Tribe has indeed cited to multiple evidentiary sources that, at the very least, demonstrate that these material facts are not undisputed and that the County Officials are not entitled to summary judgment on these issues as a matter of law.

The moving party is entitled to summary judgment when, viewing the evidence and the inferences arising therefrom in favor of the nonmoving party, there is no genuine dispute as to any material fact, and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Semegen v. Weidner,* 780 F.2d 727 (9th Cir. 1985). However, where reasonable minds could differ on the material facts at issue, summary judgment is not appropriate. *See v. Durang,* 711 F.2d 141 (9th Cir. 1983).

In evaluating the appropriateness of summary judgment, three steps are necessary: (1) determination of whether a fact is material; (2) determination of whether there is a genuine issue for the trier of fact, as determined by the documents submitted to the court; and (3) consideration of that evidence in light of the appropriate standard of proof. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48 (1986) ("*Anderson*"). Disputes concerning material facts must also be genuine. A genuine issue of material fact exists if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson,* 477 U.S. at 248. Although the court construes all facts and draws all inferences in favor of the nonmoving party, "the record must be sufficient to let a rational fact finder find that the inference nonmovant suggests is more likely than not true. A mere scintilla of evidence isn't enough." *Scott v. Henrich,* 978 F.2d 481, 485 (9th Cir. 1992).

The County Officials, as the moving party, bear the burden of showing evidence demonstrating the absence of any genuine dispute as to any material fact. *Celotex Corp.*

19

*v. Catrett* 477 U.S. 317, 323 (1986)("*Celotex*"). In addition, the County Officials, as the moving party, are required to demonstrate that there can be no factual dispute through more than just a conclusory assertion about the Tribe's evidentiary showing. *Celotex* at 328 (White, J., concurring).

Here, as in *Celotex*, the County Officials need to provide more than a conclusory assertion (i.e., "Plaintiffs cannot present any admissible evidence. . . .") whatsoever that there is no genuine dispute of material fact with regard to the Tribe's Section 1983 claims. The County Officials do not make the required showing by demonstrating the absence of an essential element of the Tribe's case through citation to evidence. The Tribe, however, has introduced evidence through documents submitted to the Court that there is a genuine dispute with regard to its Section 1983 claims that the Deputies' conduct was racially motivated and that the Deputies knew or should have known that their conduct exceeded the bounds of their authority.

The Deputies were informed on at least one occasion that they lacked the authority to enforce the civil/regulatory provisions of the California Vehicle Code against members of the Tribe within its Indian country. Declaration of Brian McDonald in Support of Plaintiffs' Supplemental Brief, pp. 3-4, ¶¶ 13-19 ("McDonald Declaration"); Declaration of Charles Wood in Support of Plaintiffs' Supplemental Brief, p. 3, ¶¶ 9-11 ("Wood Declaration"). A member of the Tribe informed the Deputies about a legal opinion from the California Attorney General supporting this assertion and offered to provide them with a copy of this opinion. McDonald Declaration, p. 4, ¶ 15, and Exhibit D. While the County Officials simply state, without citing to any of their affidavits or to the Tribe's affidavits and evidence, that the Tribe has failed to show that the conduct of the Deputies was racially motivated, the Tribe has submitted evidence that could tend to show a pattern of racial discrimination on the part of the Deputies-specifically, that they had no jurisdiction to issue Vehicle Code citations to tribal members within their Indian country, but did it anyway, and, second, that they positioned themselves for traffic stops in an area within Section 36 in which only

members of the Tribe usually have occasion to drive. Wood Declaration, p. 4, ¶ 15. The County Officials, in their Motion, do not present any evidence and only assert that the traffic stops were motivated by probable cause. They do not address, for example, why the Deputies thought, even with what would normally be probable cause, that they had the authority to issue citations to tribal members within their Indian country. The County Officials similarly fail to address why the Deputies did not select a stake-out position along Lake Havasu Road where both tribal members and non-tribal members would pass, rather than an area in which vehicle traffic consists almost solely of members of the Tribe. *Id.*

While the County Officials may have their own evidence that the Deputies acted with probable cause and were not motivated by racial discrimination (though they do not cite to it in the Motion), "[a] district court may not resolve conflicts in the evidence on summary judgment motions." *Podberesky v. Kirwan*, 38 F.3d 147, 157 (4th Cir. 1994). Because reasonable minds may differ on the material facts at issue, and because the Tribe has set forth specific facts showing that there is a genuine dispute of material fact, the County Officials should not be granted summary judgment on the issue of the Tribe's Section 1983 claims.

## CONCLUSION

The Chemehuevi have occupied the lands within the boundaries of the Reservation created by the 1907 Order since time immemorial. Over the last 100 years, numerous courts, including the United States Supreme Court, have upheld the validity of the 1907 Order establishing the boundaries of the Reservation. This Court should not overturn those decisions without clear Congressional legislation evidencing a contrary intent. In this case, no such legislative intent exists.

Section 36 is Indian country and the County Officials have no jurisdiction to enforce the Vehicle Code provisions at issue in this case against members of the Chemehuevi Indian Tribe. The Court should, therefore, deny the County Officials' motion for summary judgment.

1    Dated: June 9, 2017                          Respectfully Submitted,
2                                                 RAPPORT AND MARSTON

3                                        By:      /s/: Lester J. Marston
4                                                 LESTER J. MARSTON
                                                  Attorney for Plaintiffs
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
[Case No. 5:15-cv-01538-DMG-FFM]

**CERTIFICATE OF SERVICE**

I am employed in the County of Mendocino, State of California. I am over the age of 18 years and not a party to the within action; my business address is that of Rapport & Marston, 405 West Perkins Street, Ukiah, CA 95482.

I hereby certify that I electronically filed the foregoing with the Clerk of the United States District Court for the Central District of California by using the CM/ECF system on June 9, 2017.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct; executed on June 9, 2017, at Ukiah, California.

*/s/ Ericka Duncan*
Ericka Duncan

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
[Case No. 5:15-cv-01538-DMG-FFM]